# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                         Case No. 16-CR-20044-JAR

JULIO CESAR PEREZ-MADRIGAL,

      Defendant.

## MEMORANDUM AND ORDER

Defendant Julio Cesar Perez-Madrigal was originally charged in a criminal Complaint with two counts of violations of 18 U.S.C. §§ 922(g) and 924(a) (Doc. 1).  On May 12, 2016, Defendant was charged in an eight-count Indictment (Doc. 2) with various firearm and drug offenses.  This matter comes before the Court on Defendant's Motion to Suppress (Doc. 34) and Second Motion to Compel (Doc. 35).  Defendant moves for suppression of evidence the Government seized during a July 5, 2015 traffic stop, which relates to Counts 1 through 4 of the Indictment.  Defendant also moves to compel discovery as to eleven discovery requests relating to the Government's use of a confidential informant in the course of investigating this case.  The Court held a hearing on Defendant's motion to suppress and motion to compel on April 6, 2017, at which time the Court heard argument and testimony regarding Defendant's motions.  The motions are fully briefed and the Court is prepared to rule.  For the reasons stated in detail below, the Court grants Defendant's motion to suppress, and grants in part and denies in part Defendant's motion to compel.

I.      **Motion to Suppress**

A.      **Factual Background**

Based on the testimony and other evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence.  Officer Chris O'Neill—now a Detective with the Kansas City, Kansas Police Department ("KCKPD")—has been a law enforcement officer with the KCKPD for approximately six years.  Before becoming a law enforcement officer, Officer O'Neill received six months of training through a KCKPD-operated police academy beginning in September 2010.  This training included instruction on local, state, and federal law and policy. Officer O'Neill received forty hours of additional training each year, which included some legal instruction.  Officer O'Neill also testified that he has attempted on his own to keep up to date with changes in the law.

While Officer O'Neill was at the police academy, academy instructors discussed *Kansas v. White*,[1] a case that involved KCKPD officers.  As Officer O'Neill testified at the April 6 hearing, in *White* the Kansas Court of Appeals reversed the district court's denial of the defendant's motion to suppress because an initially lawful stop became unlawful when the officers performed a pat-down search on the defendant without reasonable suspicion.[2]  The court noted that the parties agreed the defendant in that case committed a traffic violation by continuing through an intersection after signaling otherwise.[3]  Officer O'Neill understood that the court in *White* did not explicitly find a lack of probable cause for the initial stop and that the stop was "not even objected to."  Based on his understanding of *White*, Officer O'Neill believed

---

[1] 241 P.3d 591(Kan. Ct. App. 2010).

[2] *Id.* at 600.

[3] *Id.* at 596.

that continuing through an intersection after signaling otherwise constituted a valid reason to perform a traffic stop.

The instructors at the academy did not explicitly tell officers to pull over drivers for not adhering to turn signals based on *White*, but Officer O'Neill testified that was the inference he made. Officer O'Neill could not recall whether he ever discussed these types of traffic stops with other officers or if they believed a driver's failure to adhere to a turn signal would constitute a traffic violation. Officer O'Neill recalled making at least three stops under facts similar to those in *White* and this case, where the motorist made a signal at an intersection but continued in another direction. Officer O'Neill testified that these stops have never been legally challenged.

On July 5, 2015, Officer O'Neill was on routine patrol traveling east on Schwartz Road, approaching the intersection of South 42nd Street and Argentine Boulevard from the east, when he observed a black 2007 Dodge Nitro traveling west approaching the same intersection. The vehicle signaled to turn north on 42nd Street as it approached the stop sign. But instead of turning north, the vehicle continued traveling west through the intersection. Officer O'Neill believed that the driver intended to change his direction of travel in order to avoid the police vehicle, and that the driver committed a violation of city traffic laws by continuing to travel west after signaling that he was turning north. Specifically, Officer O'Neill believed the driver had violated Unified Government of Wyandotte County/Kansas City, Kansas Code ("Municipal Code") § 35-346, by not adhering to the signal he gave. Officer O'Neill testified that he believed this was the "most applicable city ordinance."

The driver continued west on Argentine Boulevard, and went up the ramp onto northbound Interstate 635. Officer O'Neill turned around on Argentine Boulevard and pursued the Dodge until he caught up to the vehicle and initiated a traffic stop at the State Avenue exit

ramp.  Officer O'Neill made contact with the driver (Defendant), and notified him that he had stopped him for the apparent traffic infraction at 42nd and Argentine.  While speaking with Defendant, Officer O'Neill immediately smelled a strong odor of marijuana.  Defendant advised Officer O'Neill that he did not have a driver's license, and Officer O'Neill placed Defendant under arrest for not having a valid driver's license.  The Government alleges that Officer O'Neill then searched Defendant and the vehicle he was driving, and seized cash, firearms, drugs, and drug paraphernalia.[4]

### B.    Discussion

### 1.    Reasonable Suspicion

Defendant moves for suppression of the evidence obtained as a result of the July 5, 2015 traffic stop because Officer O'Neill lacked reasonable suspicion to initiate the stop.  "Whether a traffic stop is valid under the Fourth Amendment turns on whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."[5]  The Supreme Court has defined "reasonable suspicion" as a "particularized and objective basis" for believing the person being stopped is committing or did commit a violation.[6]  Reasonable suspicion is a less demanding standard than probable cause.[7]  Further, in making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" of each case to decide whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.[8]

---

[4]Because Defendant's motion challenged only the basis of the stop, not what was found as a result of the stop, the Court did not hear testimony as to the specific items Officer O'Neill allegedly recovered.

[5]*United States v. Hunter*, 663 F.3d 1136, 1142 (10th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Vercher*, 358 F.3d 1257, 1261) (10th Cir. 2004)).

[6]*United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[7]*Alabama v. White*, 496 U.S. 325, 330 (1990).

[8]*United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The Supreme Court recently held in *Heien v. North Carolina* that reasonable suspicion can rest "on a mistaken understanding of the scope of a legal prohibition."[9]  Writing for the majority, Chief Justice Roberts explained the contours of the mistake-of-law doctrine:

> The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes— whether of fact or of law—must be *objectively* reasonable.  We do not examine the subjective understanding of the particular officer involved.  And the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.[10]

Justice Kagan wrote a concurring opinion in *Heien*, in which she agreed with the majority opinion's assessment that the mistake-of-law analysis is objective and that it is a "more demanding" standard than the qualified immunity analysis.[11]  Justice Kagan also explained that the mistake-of-law analysis presents "a straightforward question of statutory construction."[12]

> If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer had made a reasonable mistake.  But if not, not.  As the Solicitor General made the point at oral argument, the statute must pose a "really difficult" or "very hard question of statutory interpretation."  And, indeed, both North Carolina and the Solicitor General agreed that such cases will be "exceedingly rare."[13]

Applying that reasoning to the facts in *Heien*, Justice Kagan explained that "[t]he critical point is that the statute poses a quite difficult question of interpretation, and Sergeant Darisse's judgment, although overturned, had much to recommend it.  I therefore agree with the Court that the traffic stop he conducted did not violate the Fourth Amendment."[14]  Justice Kagan's concurrence aligns with the majority's reasoning that the mistake-of-law doctrine applies in

---

[9]*Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014).

[10]*Id.* at 539–40 (internal citation omitted) (emphasis in original).

[11]*Heien*, 135 S. Ct. at 541(Kagan, J., concurring).

[12]*Id.*

[13]*Id.*

[14]*Id.* at 542.

situations in which law enforcement officers must make snap judgments in the field on questions of statutory construction.[15]

In *United States v. Cunningham*, the Tenth Circuit emphasized that the newly minted mistake-of-law doctrine carries with it the following "ground rules": (1) the analysis is objective, and thus an officer's subjective understanding of the law is irrelevant; (2) the doctrine is not as forgiving as qualified immunity; and (3) "an officer's mistake of law may be reasonable if the law is ambiguous (reasonable minds could differ on the interpretation) and it has never been previously construed by the relevant courts."[16]

The Court is not convinced that Defendant violated any "of the multitude of applicable traffic and equipment regulations of the jurisdiction."[17] Officer O'Neill cited Municipal Code § 35-346 as the ordinance he believed Defendant violated. Section 35-346 sets forth the following four provisions regarding "turning movements and required signals:"

> (a) No person shall turn a vehicle or move right or left upon a highway unless and until such movement can be made with reasonable safety or without giving an appropriate signal in the manner hereinafter provided.
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last 100 feet traveled by [the] vehicle before turning.
> (c) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.
> (d) The signals required on vehicles by section 35-789(b) shall not be flashed on one side only on a disabled vehicle, flashed as a courtesy or "do not pass" signal to operators of other vehicles approaching from the rear or be flashed on one side only of a parked vehicle except as may be necessary for compliance with this section.[18]

---

[15]*Id.* at 539 ("Heien's point does not consider the reality that an officer may 'suddenly confront' a situation in the field as to which the application of a statute is unclear—however clear it may later become. A law prohibiting 'vehicles' in the park either covers Segways or not, but an officer will nevertheless have to make a quick decision on the law the first time one whizzes by.").

[16]630 F. App'x 873, 876–77 (10th Cir. 2015) (quoting *Heien*, 135 S. Ct. 539–40).

[17]*United States v. Hunter*, 663 F.3d 1136, 1142 (10th Cir. 2011).

[18]Unified Gov't of Wyandotte Cty./Kan. City, Kan. Code § 35-346.

K.S.A. § 8-1548 contains four provisions that are nearly identical to the Municipal Code provisions above. The Municipal Code and K.S.A. § 8-1548 each provide rules for when and how a signal must be used if it is required.[19] But neither the Municipal Code nor the Kansas statute prohibit a driver from using a turn signal at an intersection and continuing to drive in a direction contrary to the direction of the signal.[20] Indeed, Officer O'Neill testified that the city ordinance did not explicitly prohibit Defendant's conduct. Rather, Officer O'Neill believed that § 35-346 was simply the "most applicable ordinance."

Because Municipal Code § 35-346—the ordinance Officer O'Neill cited as the basis for the stop—did not prohibit Defendant's conduct, the Court must determine whether Officer O'Neill's mistake of law was reasonable such that it supported reasonable suspicion that a traffic violation occurred. The Government argues that Officer O'Neill's belief that Defendant had committed a traffic violation was reasonable based on (1) his understanding of § 35-346; (2) his understanding of the *Kansas v. White* case; and (3) the fact that he had stopped several other drivers under similar circumstances and these stops had never been challenged in court.

Officer O'Neill's belief that Municipal Code § 35-346 prohibited a driver from continuing in a direction different than a given signal would not be reasonable if based only on a reading of the Municipal Code. Unlike the statute at issue in *Heien*, here the Municipal Code is not ambiguous. It sets forth rules for when a signal must be used and if so how the signal must be used. But it does not address in any way when a signal *cannot* be used. Section 35-346 does not present a "really difficult" or "very hard" question of statutory interpretation.[21]

---

[19]*Id.*; K.S.A. § 8-1548.

[20]Unified Gov't of Wyandotte Cty./Kan. City, Kan. Code § 35-346; K.S.A. § 8-1548.

[21]*Heien*, 135 S. Ct. at 541.

Instead, the face of the Municipal Code and the corresponding Kansas statute make clear these laws do not prohibit failing to adhere to a signal.

The Court thus turns to whether Officer O'Neill's belief was reasonable in light of *Kansas v. White* and the unchallenged pattern of traffic stops he made under similar circumstances. As for the *White* case, the Court first notes that case did not address Municipal Code § 35-346 or K.S.A. § 8-1548. It is therefore difficult to conceive how any findings in that case would support a reasonable belief regarding the scope of Municipal Code § 35-346 or K.S.A. § 8-1548. To be sure, the court in *White* noted that "[t]he parties apparently agree that White committed a turn signal violation which justified the stop."[22] But importantly, the court made no findings as to the lawfulness of the stop and did not analyze in any way the legal basis for the stop. The court in *White* did not endorse the type of stop at issue in this case, and the Government has pointed to no legal authority that would support the notion that Officer O'Neill's reliance on *White* for such an endorsement was reasonable.

Reliance on a passing statement by a court regarding a stipulation by two parties does not suffice for reasonable legal authority to support stopping motorists for violations that are not recognized by city or state traffic laws. The Court could speculate as to why parties would stipulate to the lawfulness of a stop regardless of the strength of the legal basis for the stop.[23] But the important point is that the court in *White* never had the opportunity to pass upon the lawfulness of the initial stop in that case, and the Court did not suggest in any way that it approved of the reason for the initial stop. The mistake-of-law doctrine, which is "not as forgiving" as the qualified immunity analysis, demands more than a stray comment about a

---

[22]*Kansas v. White*, 241 P.3d 591, 596 (Kan. Ct. App. 2010).

[23]For example, the defendant may focus on challenging other aspects of the law enforcement interaction. This may have been the case in *White*. There, the Court found that although the parties had agreed to the initial lawfulness of the stop, the later pat-down search was unlawful. *Id.* at 600.

stipulation in a specific case to support a reasonable belief about the lawfulness of a given traffic maneuver. Where, as here, an officer initiates a stop for a traffic violation that is not actually spelled out in any of "the multitude of applicable traffic and equipment regulations of the jurisdiction," the legal basis of the stop must be more precise than simple dicta. Accordingly, the Court finds that reliance on *White* for the legal basis of the stop at issue here was not reasonable.

Finally, the Court turns to Officer O'Neill's comment that he had performed several similar stops over the years and that these stops had never been challenged. The Government argues that this fact demonstrates Officer O'Neill's belief regarding the legality of the stop was reasonable. The Court is not persuaded that this practice supported a reasonable belief that the stop of Defendant was legal. To the contrary, the Court harbors concern with this logic. The fact that previous similar encounters have gone unchallenged has no bearing on whether continued stops of the same variety are reasonable or legal. Again, the Court could conjure up many speculative theories as to why previous drivers did not challenge the failure-to-adhere-to-signal stops.[24] Whatever the reason, the sole fact that those stops went unchallenged does not add weight to the objective reasonableness of the officer's belief. To hold otherwise might encourage the use of unlawful law enforcement practices in the hope that a pattern of those stops would eventually lead to acceptance of the stops as reasonable. Thus, the Court finds Officer O'Neill's previous stops of motorists for failing to adhere to turning signals did not give rise to an objectively reasonable belief that such stops were legal.

In sum, the Court finds that Officer O'Neill lacked an objectively reasonable belief that his stop of Defendant was lawful. A plain reading of the relevant local and state traffic laws reveals that failing to adhere to a turn signal is not a recognized traffic violation. Additionally,

---

[24]Perhaps those previous stops ended in only a warning, or the resulting charges were dismissed on other grounds, or the drivers accepted plea deals before having opportunities to challenge the stops.

although Officer O'Neill testified he relied on his training at the police academy in believing *Kansas v. White* created a traffic violation for failing to adhere to a turn signal, such a belief was misguided and not objectively reasonable. The court in *White* never expressed an opinion, much less a finding, on the legality of the stop at issue in that case, but instead simply recognized the agreement of the parties on that issue. The mistake-of-law doctrine requires more. Finally, the Court cannot find that a pattern of similar stops in the past that have gone unchallenged translates into a reasonable belief regarding the lawfulness of such stops. Because Officer O'Neill's mistake of law was not objectively reasonable, the Court finds that he lacked reasonable suspicion to stop Defendant for a traffic violation.

## 2. Exclusionary Rule

The Government argues that even if Officer O'Neill's mistake of law was not reasonable, the exclusionary rule should not apply. Even when a Fourth Amendment violation exists, exclusion of evidence "is not an automatic consequence of a Fourth Amendment violation."[25] Exclusion is a remedy courts may choose to apply as a "prudential" matter, not one individuals may insist on as a matter of "personal constitutional right."[26] Exclusion of evidence is a "judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'"[27] The "purpose of the [exclusionary] rule is not to redress the injury to the privacy of the search victim"; instead, its "prime purpose is to deter future unlawful police conduct."[28] Once the defendant shows by a preponderance of the evidence that the exclusionary rule applies based on a causal nexus between the violation and the evidence sought to be

---

[25] *Herring v. United States*, 555 U.S. 135, 137 (2009).

[26] *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks omitted).

[27] *Herring*, 555 U.S. at 139–40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

[28] *Calandra*, 414 U.S. at 347 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

excluded, the burden shifts to the government to prove that an exception to the exclusionary rule applies.[29]

In determining whether exclusion is the appropriate remedy in this case, the Court follows the mode of analysis dictated by two recent Supreme Court decisions.  In *Herring v. United States*, the Court extended the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee.[30]  The Court concluded that negligent bookkeeping was no reason to exclude evidence found when an officer executed, in good faith, an arrest warrant that had been recalled, but for which the database had not been updated to reflect the recall.[31]  In discussing the principles of the exclusionary rule, the Court stated that "[t]he extent to which the exclusionary rule is justified by . . . deterrence principles varies with the culpability of the law enforcement conduct."[32]  Thus, "assessment of the flagrancy of the police misconduct constitutes an important step in the calculus of applying the exclusionary rule."[33]  The Court went on to explain that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[34]  As such, "the [past] abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional."[35]  The Court clarifed that the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all the

---

[29]*United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

[30]555 U.S. 135, 143–48 (2009).

[31]*Id*. at 137–38.

[32]*Id*. at 143.

[33]*Id*. (quotation omitted).

[34]*Id*. (quotation omitted).

[35]*Id*.

circumstances."[36]  In declining to apply the exclusionary rule on these facts, the Court explained that the rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence.  The error in this case does not rise to that level."[37]

And, in *Davis v. United States*, the Court held that the exclusionary rule should not be applied to a search that was conducted in reliance upon binding judicial precedent that was later overruled.[38]  The Court explained that the deterrence benefits of exclusion vary depending on the culpability of the law enforcement conduct.[39]  When law enforcement exhibits deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh its high cost to the judicial system and society at large.[40]  The deterrence benefits associated with exclusion outweigh the costs, too, when law enforcement exhibits "recurring or systemic negligence."[41]  But when law enforcement officers behave only non-negligently "or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force."[42]  In these cases, the deterrent value is much lower and exclusion cannot "pay its way."[43]

The Court finds by a preponderance of the evidence that Defendant has met his burden in demonstrating a causal nexus between the stop that was not supported by reasonable suspicion and the evidence sought to be excluded.  Indeed, the unlawful stop here was the but-for cause of

---

[36]*Id*. at 145 (quotation omitted).

[37]*Id*. at 144.

[38]131 S. Ct. 2419 (2011).

[39]*Id*. at 2427.

[40]*Id*. (citations omitted).

[41]*Id*. at 2428.

[42]*Id*. at 2427–28 (citations omitted) (internal quotation marks omitted).

[43]*Id*. (quoting *United States v. Leon*, 468 U.S. 897, 908 n.6 (1984)).

the seizure of the relevant evidence.  Having found that Defendant has met his burden in demonstrating that the exclusionary rule applies, the burden shifts to the Government to articulate an exception or other rationale to justify not applying the rule.

The Government first argues that the good-faith exception applies because Officer O'Neill acted with an "objectively reasonable good-faith belief that his conduct was lawful." The Court has found above that Officer O'Neill's mistake of law was not objectively reasonable.[44]  As the Tenth Circuit has explained, "[*United States v.*] *Leon's* good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer."[45]  Here, even if Officer O'Neill's reliance was on someone else—*i.e.*, the person(s) providing training at the Academy—that reliance was not objectively reasonable.  Accordingly, the Court finds that the Government has not met its burden in demonstrating that the good-faith exception applies here.

Additionally, the Government argues that the exclusionary rule should not apply because Officer O'Neill's conduct was not deliberate, reckless, grossly negligent or otherwise sufficiently culpable to trigger application of the exclusionary rule.  The Court is satisfied that Officer O'Neill did not act deliberately or intentionally in violation of Fourth Amendment law.  But the Court is not convinced that Officer O'Neill acted without gross negligence in stopping motorists for violations that were not enumerated in local or state traffic laws.  More importantly, the record demonstrates more than "only simple, isolated negligence."[46]  Officer O'Neill testified that he was instructed on *Kansas v. White* at the police academy in a way that left him with the mistaken impression that the case endorsed traffic stops where a driver fails to adhere to a turn

---

[44]*See supra* Part I.B.1.

[45]*United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006).

[46]*Davis*, 131 S. Ct. at 2427–28.

signal.  Although Officer O'Neill stated that he had not spoken to other officers regarding their views on these types of stops, it is reasonable to assume that other officers left training with the same impression as Officer O'Neill.  Furthermore, Officer O'Neill testified that he has engaged in several traffic stops for failure to adhere to a turn signal, at least in part based on his instruction on *White*.  Thus, given that Officer O'Neill has alone engaged in a number of these stops, it appears that a potentially large number of KCKPD officers may have been trained in a way that could leave them with the mistaken impression that these stops were lawful.  The Government has not met its burden in demonstrating that the negligence here was only "simple" or "isolated."

Finally, the Government argues that "the benefits of applying the exclusionary rule on these facts would not outweigh the substantial costs involved, which include letting a guilty defendant go free."[47]  As an initial matter, the Court notes that applying the exclusionary rule "on these facts" would not necessarily include letting a guilty defendant go free—Defendant is presumed innocent until he enters a guilty plea or is found guilty at trial.[48]  But the Court is certainly aware that the *potential* cost of applying the exclusionary rule here is that "[t]he criminal is to go free because the constable has blundered."[49]   Thus, the Court must balance the benefits and costs of applying the exclusionary rule.  The Court finds that the societal benefits of applying the exclusionary rule apply strongly here, where the conduct involves repeated instances of traffic stops that were not supported by reasonable suspicion of violations of local or

---

[47]Doc. 48 (citing *Herring v. United States*, 555 U.S. 135 (2009)); *see Utah v. Strieff*, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016) (explaining that exclusionary rule applies only "where its deterrence benefits outweigh its substantial social costs").

[48]*E.g., In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)) (explaining that presumption of innocence is a "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law'").

[49]*Nix v. Williams*, 467 U.S. 431, 447 (1984) (citing *People v. Defore*, 150 N.E. 585, 587 (1926)) (internal quotation marks omitted).

state traffic laws. Application of the exclusionary rule here would likely serve to deter repeated instances of these traffic stops.

Turning to the costs of the exclusionary rule, the Court recognizes that evidence of the items seized as a result of the stop—drugs, drug paraphernalia, apparent drug proceeds, and firearms—would not be available at trial. But even assuming that application of the exclusionary rule would equate to acquittal on the four Counts related to the evidence seized as a result of the traffic stop, the Court is not persuaded that this would mean Defendant would "go free." Defendant faces four other charges that carry potentially weighty sentences in the event he is found guilty. The presence of these additional Counts mitigates the costs of the exclusionary rule in this case. Accordingly, the Court finds that the societal benefits of deterring repeated instances of unlawful traffic stops outweigh the substantial social costs of suppressing the evidence seized as a result of the traffic stop.

Ultimately, the Court finds by a preponderance of the evidence a but-for causal relationship exists between the unlawful traffic stop and the seizure of the evidence that is the subject of Defendant's motion. The Court further finds the Government has not met its burden in demonstrating that the good-faith exception to the exclusionary rule applies. Additionally, the societal benefits in deterring the pattern of unlawful stops here, which amounts to more than "simple" or "isolated" negligence, outweighs the costs of suppressing the evidence that was obtained as a result of the unlawful stop. Therefore, the Court finds that the exclusionary rule applies and there is no applicable exception.

## C. Conclusion

Officer O'Neill's traffic stop of Defendant was not supported by reasonable suspicion because Officer O'Neill did not have an objectively reasonable belief that Defendant had

committed a traffic violation. The relevant local and state traffic laws did not prohibit or even address Defendant's conduct. Neither *Kansas v. White* nor unchallenged stops under similar circumstances in the past provide reasonable support for the notion that Defendant committed a traffic violation. Additionally, it is clear that a but-for causal nexus exists between the unlawful stop and the seizure of the evidence sought to be suppressed. The Government has not met its burden in demonstrating by a preponderance of the evidence that an exception to the exclusionary rule applies, and the Court finds that the societal benefits in deterrence outweigh the costs of suppression. Accordingly, the Court grants Defendant's motion to suppress.

## II. Second Motion to Compel

Defendant moves to compel certain discovery regarding the Government's use of a confidential informant ("CI") in relation to the conduct charged in several Counts of the Indictment. The Court previously granted a motion to compel videos involving the CI related to Counts 5 and 6.[50] In the motion to compel currently before the Court, Defendant makes eleven discovery requests related to the use of the CI. The parties have fully briefed the motion, and also made argument on the motion at the April 6, 2017 hearing. At the request of the parties, the Court granted leave to file supplemental briefings on this motion after the April 6 hearing. Neither party submitted any additional briefings. Having considered the arguments in the parties' moving papers and at the April 6 hearing, the Court is now prepared to rule. For the reasons explained below, the Court grants in part and denies in part Defendant's motion to compel.

Before delving into analysis of each of Defendant's discovery requests, the Court first addresses two issues that apply to several of the requests. First, the Government argued at the

---

[50]*See* Doc. 26. The parties did not specify in their briefings or at the hearing on this motion which Counts the CI's testimony and alleged involvement relates to. But based on the previous motion to compel, it appears this motion implicates Counts 5 and 6.

hearing, at least with respect to Requests Five and Six, that it was concerned with producing discovery documents bearing the CI's signature more than fourteen days before trial, because those documents would identify the CI. The Government appears to make this argument in the interest of the CI's safety. Because documents relevant to a number of Defendant's Requests may identify the CI by name, the Court addresses the Government's concern at the outset.

In its Memorandum and Order granting Defendant's first motion to compel, the Court discussed the standards for determining whether to disclose the identity of a CI before trial, defense.[51] The Government argues that Defendant's interest is light because the CI's involvement in this case was fairly small; he was involved only in the investigation of two or three of the eight Counts at issue in this case. But even if the CI was not involved in the investigation of all the Counts in this case, his involvement and testimony may be central to the two or three Counts that he was involved in, and Defendant has a substantial interest in preparing a defense against these charges.

Additionally, the Court finds the Government's assertions as to its interests in the CI's safety largely unpersuasive for three reasons. First, the Government was previously ordered to produce videos allegedly containing interactions between Defendant and the CI.[52] Thus, although the Government was not required to name the CI, in practical effect the CI's identity was disclosed. Second, the Government conceded at the hearing on Plaintiff's earlier motion to compel that Defendant likely already knows the CI's identity, which would be unsurprising given that the CI allegedly engaged in drug transactions with Defendant.[53] Third, it seems a

---

[51]*Id.* at 3 (citing *Rovario v. United States*, 353 U.S. 53, 60–62 (1957); *United States v. Moralez*, 908 F.2d 565, 567 (10th Cir. 1990); *United States v. Halbert*, 668 F.2d 489, 495–96 (10th Cir. 1982) (citations omitted); *United States v. Osorieo-Torres*, No. 12-40043-02-RDR, 2012 WL 5831186, at *9 (D. Kan. Nov. 13, 2012)).

[52]*Id.*

[53]*Id.* at 6.

stretch that the CI's interest in safety would be more than marginally advanced by withholding the CI's identity until fourteen days before trial, and then suddenly revealing his or her identity at that time.

Despite the weaknesses in the Government's safety rationale, the Court recognizes that the Government has an interest in protecting the flow of information to law enforcement officers. Thus, although the Court strongly encourages the Government to engage in open discovery by producing un-redacted documents to enable Defendant to prepare a defense and to ensure trial is not unnecessarily prolonged,[54] the Court will not require the Government to disclose the identity of the CI at this time. To the extent Defendant's motion to compel is granted below, the Government may provide copies of documents with the CI's name, signature, and initials redacted. However, if the Government chooses to disclose documents in this way, it must produce un-redacted copies of the documents by no later than fourteen days before trial.

Second, the Government argues that to the extent it is compelled to produce the requested discovery, it should not be compelled to do so sooner than fourteen days before trial. Defendant argues that fourteen days before trial is not sufficient time to make effective use of the information or to prepare a defense. The Court agrees. The Pretrial Order effective in this case provides that the Government must produce *Brady* evidence by no later than fourteen days before trial, and must produce *Giglio* evidence "sufficiently in advance of trial that the defendant may make effective use of the information."[55] The Pretrial Order also states that "[i]t is the

---

[54]*See* Doc. 26 at 14–16 (discussing Court's concerns with protected discovery in Kansas City Division).
[55]Doc. 9 at 8.

continuing duty of counsel for all parties to *immediately* reveal to opposing counsel any newly discovered information or other material within the scope of this order."[56]

As the Court explained at the hearing on the motion to compel, much of the requested discovery in this case could potentially constitute *Brady* or *Giglio* evidence. Additionally, the agreements, criminal histories, and other records sought here could potentially be voluminous and may contain detailed information.[57] For these reasons, the Court finds that fourteen days before trial is not sufficient for Defendant to "make effective use of the information." Mandating earlier production of any evidence that the Court compels will foster meaningful plea negotiation and better trial preparation, and the resulting efficiency will benefit both parties and the Court. Additionally, as the Pretrial Order states, the Government has a continuing duty to "immediately" produce "newly discovered information or other material within the scope of this order."[58] Therefore, to the extent the Court grants Defendant's motion to compel, the Court directs the Government to provide the relevant information to Defendant immediately once it becomes available, unless otherwise stated below. However, as explained above, the identity of the CI is not subject to this requirement. Again, although the Court doubts the Government's rationale for withholding the identity of the CI, the Government may redact the identity of the CI from discovery that is the subject of this order until fourteen days before trial.

---

[56]*Id.* at 11 (emphasis added). The Court has adopted a new Pretrial Order that contains a similar provision that "Discovery must be completed within 30 days after arraignment, to the extent possible. Any such discovery not provided by 30 days after arraignment must be promptly provided upon availability." Pretrial and Criminal Case Management Order, District of Kansas, *available at http://www.ksd.circ10.dcn/pretrial-and-criminal-case-management-order/* (last accessed May 16, 2017). This new Pretrial Order, although not applicable to this case, reflects the sentiment in the Pretrial Order applicable to this case that discovery should be "promptly provided" as it becomes available.

[57]*See United States v. Wright*, No. 00-40024-01-SAC, 2001 WL 1456856, at *1 (D. Kan. Oct. 10, 2001) ("The Court's impression is that the volume of such information, its detailed nature, and the likelihood of it generating additional investigation warrant disclosure earlier than the fourteen-day period offered by the government.").

[58]Doc. 9 at 11.

Having addressed these two initial issues, the Court now turns to each of Defendant's discovery requests. Because the parties addressed several of Defendant's requests in groups in their briefs and at the April 6 hearing, the Court will do the same.

**Request No. 1**
"The Attorney General's Guidelines Regarding the Use of Confidential Informants" that was in effect at all times the confidential source was used.

The Government argues that because the Attorney General's Guidelines Regarding Use of Confidential Informants ("Guidelines") are publicly available on the Department of Justice ("DOJ") website, the Government need not provide this information to Defendant.[59] Defendant argues that the Government should be required to provide the Guidelines to ensure Defendant has access to the official Guidelines in effect at the time the CI was used. The Government argued at the April 6 hearing that the current version of the Guidelines are available on the DOJ website. In support of this assertion, the Government cited *Hall v. United States*, a 2005 District of Nevada case that recognized the availability of the Guidelines on the DOJ's website.[60] The only Guidelines apparently available on the DOJ website are contained within a redacted September 2005 report by the DOJ Office of Inspector General.[61] Although the Guidelines available on the DOJ's website may still be in effect, it is also possible that the Government has updated the Guidelines within the past twelve years, in which case *Hall* would not be instructive as to the availability of the current Guidelines. Therefore, to ensure Defendant has access to the

---

[59]The Government argued at the April 6 hearing that the information was available on websites other than DOJ's site. As the Court explained at that hearing, Defendant's concern about the reliability of internal documents displayed on non-DOJ websites is legitimate. Unless the Guidelines are publicly available on the DOJ's website, the Government must provide the Guidelines to Defendant.

[60]233 F.R.D. 591, 598 (D. Nev. 2005).

[61]Office of Inspector General, Special Report: The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines, *Chapter Three: The Attorney General's Guidelines Regarding the Use of Confidential Informants* (Sept. 2005), available at https://oig.justice.gov/special/0509/chapter3.htm (last accessed May 15, 2017).

official, un-redacted version of the Guidelines in effect at the time the CI was used, the Court

grants Defendant's motion as to his Request Number One.

**Request No. 2**
The initial suitability review and recommendations regarding the confidential source, including
any initial debriefing and risk assessment, as well as any approval or denial for using the
confidential source from a field manager (including a Group Supervisor, an Assistant Special
Agent in Charge, or a Special Agent in Charge) and any concurrence by a prosecutor.

**Request No. 3**
Any request for the confidential source to engage in Tier I or Tier II otherwise unlawful
behavior, as well as any approval or denial of that request.

**Request No. 4**
Any continuing suitability review of the confidential source.

The Government concedes that it has a duty to provide these documents to the extent they

contain impeachment material, and thus the Court grants Defendant's Requests Two through

Four to the extent they seek factual information that could serve as impeachment evidence. The

Government argues, however, that the information is not otherwise discoverable because it

would constitute inadmissible extrinsic impeachment evidence, and because the deliberative

process privilege applies.

At the outset, the Court notes that information sought in discovery need not be admissible

at trial if the discovery appears reasonably calculated to lead to the discovery of admissible

evidence.[62] Here, the discovery requests are reasonably calculated to lead to the discovery of

information that may be admissible as impeachment evidence.[63] Thus, the Court is not

persuaded by the Government's initial argument as to admissibility of extrinsic impeachment

evidence.

---

[62]*MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318JWL-DJW, 2007 WL 3231568, at *2 (D. Kan. Oct. 30,
2007); *Harroald v. Triumph Structure-Wichita, Inc.*, No. 10-1281-JAR-KGG, 2011 WL 2118648, at *3 (citing
*Teichgraeber v. Memorial Union Corp. of Emporia State Univ.*, 932 F. Supp. 1263, 1265 (D. Kan. 1996))
("'Discovery relevance is minimal relevance,' which means it is possible and reasonably calculated that the request
will lead to the discovery of admissible evidence.").

[63]*See* Fed. R. Evid. 608(b).

Turning to the deliberative process privilege, Defendant argued at the April 6 hearing that application of this privilege requires the Government to formally invoke the privilege by submitting an affidavit of a government official who seeks to invoke it.[64] While the Court is not convinced that the deliberative process privilege requires formal invocation through an affidavit, the Court recognizes that the Government bears the burden of establishing the applicability of the privilege.[65] The deliberative process privilege shields documents that "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."[66] To gain protection under the privilege, a document must be both pre-decisional and deliberative.[67]

A document is pre-decisional if it is "prepared in order to assist an agency decisionmaker in arriving at his decision."[68] The Tenth Circuit has cited two factors that are "helpful" in determining whether a document is pre-decisional: (1) "the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document;'" and (2) "the relative positions in the agency's 'chain of command' occupied by the document's author and recipient."[69] The essential question is whether the requested document is "'expressly subject to disclosure' as the final opinion 'explaining the reasons' for a [ ] decision already made or,

---

[64]*See Cobell v. Norton*, 213 F.R.D. 1, 8–10 (D.D.C. 2003).

[65]*Greenpeace v. Nat'l Marine Fisheries Serv.*, 198 F.R.D. 540, 543 (W.D. Wash. 2000) (citing *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 854 (3d Cir. 1995)); *United States v. Philip Morris USA, Inc.*, 218 F.R.D. 312, 315 (D.D.C. 2003) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980)).

[66]*N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Kaiser Aluminum & chem. Corp. v. United States*, 157 F. Supp. 939, 946 (Ct. Cl. 1958)); *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, (2001)).

[67]*Trentadue*, 501 F.3d at 1227.

[68]*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).

[69]*Casad v. U.S. Dep't of Health & Human Servs.*, 301 F.3d 1247, 1252 (10th Cir. 2002).

instead, a pre-decisional memorandum protected from disclosure under the deliberative process privilege."[70]

A pre-decisional document also has to be "deliberative," meaning it is a part of the agency's deliberative process.  A document is considered a part of the deliberative process if it relates to government decision-making and its disclosure to the public "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."[71]

Additionally, while non-factual materials that express opinions or recommendations are clearly protected under the deliberative process privilege,[72] "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context" are not protected unless they are "inextricably intertwined with policy-making processes" or the disclosure itself would expose the agency's deliberative process.[73]  The court should apply a "flexible, commonsense approach" to the factual versus deliberative classifications.[74]

In light of these standards, the Court finds that the following information or documents are not protected by the deliberative process privilege: (1) the initial suitability review of the CI; (2) any approval or denial for using the CI from a field manager; (3) any concurrence by a prosecutor to using the CI and (4) any continuing suitability review of the CI.  The Government has not met its burden in showing that this discovery contains pre-decisional opinions made in the course of the decision-making process.  Rather, these discovery items appear to be final

---

[70]*Id.* at 1251–52 (quoting *Renegotiation Bd.*, 421 U.S. at 170).

[71]*Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).

[72]*Trentadue*, 501 F.3d at 1227 (citing *N.L.R.B.*, 421 U.S. at 150).

[73]*Id.*

[74]*Id.*

opinions explaining the reasons for a decision already made, *i.e.*, the suitability of the CI and approval or denial to engage in otherwise unlawful activity.[75]  Accordingly, the Court grants Defendant's Request Numbers Two and Four as they relate to the four items described above.[76]

In Request Number Three, Defendant seeks any request for the CI to engage in Tier I or Tier II otherwise unlawful behavior, as well as any approval or denial of that request.  The Court finds that requests for the CI to engage in otherwise unlawful behavior and any resulting approval or denial fall within the deliberative process privilege.  These requests would be made before any final decision on the CI engaging in unlawful behavior, thereby reflecting the pre-decisional opinions of the author.  The requests and resulting approvals or denials would be deliberative, in that they would expose with full context the process for making decisions on this issue.[77]  Thus, the Court denies Defendant's motion to compel as it relates to Request Number Three.[78]

---

[75]*Casad*, 301 F.3d 1251–52 (quoting *Renegotiation Bd.*, 421 U.S. at 170).

[76]The Court notes that the Government has not asserted attorney-client privilege as it relates to any concurrence by a prosecutor to using the CI.  The Government would bear the burden of establishing the applicability of the privilege, *In re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010), and the Court is not convinced that the privilege would apply even if it had been asserted.

[77]Approvals or denials alone, as sought in Defendant's Request Number Two, do not appear to be deliberative, as they do not reveal the entire deliberative process for using a CI.  Instead, they reveal only the final opinion or decision on the issue.  But when combined with a request for a CI to do something, as in Request Number Three, approvals or denials reveal much more of the government's pre-decisional deliberative process.

[78]Of course, purely factual information contained within the documents described in Request Number Three, such as any criminal history of the CI or other impeachment evidence, would not be protected by the deliberative process privilege.  Indeed, such information is subject to mandatory disclosure pursuant to *Brady* and *Giglio*.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

**Request No. 5**
Any written instructions given to the confidential source, whether or not those instructions bear the confidential source's initials or signature.

**Request No. 6**
Any revocation of the confidential source's authority to engage in otherwise unlawful activity.

The Government argues that the deliberative process privilege applies to these Requests, and that the Requests are overbroad in that they seek "any written instructions" and "any revocation of the [CI]'s authority."[79] The deliberative process privilege does not apply to these requests. The Government has not met its burden in demonstrating the relevant documents are pre-decisional opinions, rather than directives to the CI and documents reflecting any of the Government's decisions to revoke the CI's authority to engage in otherwise unlawful activity.

The Court agrees, however, that Request Numbers Five and Six as drafted are overbroad. Production in response to these Requests could result in discovery of instructions to the CI or revocations of his or her authority in other investigations that have little or nothing to do with the investigation of this case. Therefore, the Court grants Defendant's motion to compel with respect to Request Numbers Five and Six, but only as they relate to instructions to the CI or revocations of his or her authority to engage in unlawful behavior in the course of the investigation of *this* case. Discovery outside of that scope must be produced only to the extent that it includes potential impeachment evidence.

**Request No. 7**
Any notification that the confidential source was being prosecuted, had become the target of another investigation, or was expected to become the target of another investigation.

The Government contends that this Request is overbroad, as it seeks "any notification" to any authorities—local, state, or federal—that the CI was being prosecuted or investigated, and it

---

[79] The Government also argues that documents potentially relevant to these requests contain the CI's signatures, and that the Government should not be required to reveal these signatures or the CI's identity until fourteen days before trial. The Court has previously considered the Government's request and granted leave to redact the CI's identity from relevant documents until fourteen days before trial.

does not contain limitations as to time. But the Request seeks only information that the CI "was being prosecuted, had become the target of another investigation, or was expected to become the target of another investigation." This language clearly applies to notifications that the CI was being prosecuted or investigated during the course of the investigation of this case, or might become the target of an investigation in the future. The Request is not overbroad for lack of temporal limitations. Additionally, "any notifications" of current or future prosecutions or investigations of the CI would apply only to law enforcement agents and officers involved in the investigation of this case, rather than law enforcement officers at large. The Court is not concerned that Request Number Seven is overbroad.

The Government also notes that Defendant is seeking this information to "show the source's lack of trustworthiness,"[80] and argues that "trustworthiness" is not an impeachable character trait. While "truthfulness" is an impeachable trait, the Government argues, "trustworthiness" is not.[81] In addition to arguing in his brief that he seeks this discovery for evidence of the CI's lack of "trustworthiness," Defendant also argued at the April 6 hearing that this discovery could lead to evidence of bias on the part of law enforcement agents if they were alerted that the CI was under investigation but nonetheless utilized him. Evidence of bias is admissible under *Brady* as impeachment evidence.[82] Accordingly, the Court finds that Request Number Seven is reasonably calculated to lead to the discovery of admissible evidence. Defendant's motion to compel is granted as to Request Number Seven.

---

[80]Doc. 35 at 7.

[81]*See* Fed. R. Evid. 608.

[82]*United States v. Bagley*, 473 U.S. 667, 676–77 (1985).

**Request No. 8**
The confidential source's history, as contained in the Confidential Source System Concorde ("CSSC").

The Government consents to disclosing the CI's history of criminal convictions, but argues that the Request is otherwise overbroad, and argues that it is unaware what the "Confidential Source System Concorde" is. To the extent the Government has access to the "CSSC" and this database contains a history of the CI that contains any impeachment evidence that would not be included in a traditional criminal history document —including a history of dishonesty or other instances of bad conduct—the Court directs the Government to disclose this evidence. Accordingly, the Court grants Defendant's motion to compel as to Request Number Eight.

**Request No. 9**
Any records containing compensation, whether monetary or otherwise, paid to the confidential source, whether contained in CSSC or not.

The Government has agreed to provide this information. The Court therefore grants as unopposed Defendant's motion to compel as to Request Number Nine.

**Request No. 10**
Any communications, however stored, between the confidential source and any law-enforcement officer or governmental agent.

The Government argues that this Request is overbroad, in that it refers to "any communications" to "any agent." The Court agrees that the Request as written is overbroad. Therefore, the Court grants Request Number 10, but only as to communications made by the CI to government agents in the course of the investigation of this case. The Court recognizes that some of these potential communications may fall within the scope of the Jencks Act,[83] which mandates production of witness statements only after the witness has testified on direct

---

[83] 18 U.S.C. § 3500.

examination.[84]  The Pretrial Order states that "[t]o avoid delay during trial, though, the [C]ourt strongly urges the government to provide [Jencks Act] statements **at least 48 hours before the witness's scheduled appearance.**"[85]  Indeed, as a practical matter, the Court encourages any production of these statements at an earlier time, "in the interest of fairness and the efficient and expeditious resolution of cases,"[86] and the Court recognizes the Government's assertion at the hearing on this motion that it has already turned over many statements that have been made in connection with this case.  Accordingly, the Court grants Defendant's motion to compel as to Request Number Ten to the extent it relates to communications in the course of the investigation of this case.

**Request No. 11**
Every DEA-512 form regarding the confidential source.

Defendant seeks every DEA-512 form regarding the CI, which Defendant asserts are continuing suitability assessments.  Although Defendant sought these assessments as they relate to the investigation of this case in Requests Two and Four, Defendant seeks all other similar assessments that may reveal that the CI was unsuitable and that the Government nonetheless used the CI.  The Government argues that Defendant is not entitled to DEA-512 forms pursuant to Fed. R. Crim. P. 16(a)(2).  Rule 16(a)(2) provides:

> **(2) Information Not Subject to Disclosure.**  Except as permitted by Rule 16(a)(1)(A)–(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

---

[84]*Id.*; *United States v. Smith*, 984 F.2d 1084, 1085 (10th Cir. 1993).

[85]Doc. 9 at 9 (emphasis in original).

[86]*See* Pretrial and Criminal Case Management Order, District of Kansas, *available at* http://www.ksd.circ10.dcn/pretrial-and-criminal-case-management-order/ (last accessed May 16, 2017).

The Government argues that Rule 16(a)(2) "clearly exempts" discovery of the DEA-512 forms at issue in Request Number Eleven. But rather than exempting or prohibiting discovery as to certain matters, Rule 16 "'is intended to prescribe the minimum amount of discovery to which the parties are entitled,' and leaves intact a court's 'discretion' to grant or deny the 'broader' discovery requests of a criminal defendant."[87] However, to the extent the DEA-512 forms were made by a government agent or attorney in connection with investigating or prosecuting the case, Rule 16 does not authorize their discovery. Additionally, the Court has already granted Defendant's motion to compel as it relates to the continuing suitability assessments of the CI that were made in the course of the investigation of this case. Therefore, the Court denies Defendant's motion to compel as it relates to other DEA-512 forms, except to the extent these forms contain potential impeachment evidence, which would be subject to mandatory disclosure under *Brady* and *Giglio*.

In sum, the Court grants in part and denies in part Defendant's motion to compel as follows:

- Defendant's Request Number One is **granted.**

- Defendant's Request Number Two is **granted.**

- Defendant's Request Number Three is **denied.**

- Defendant's Request Number Four is **granted.**

- Defendant's Request Numbers Five and Six are **granted in part and denied in part**, with the limitations set forth above.

- Defendant's Request Number Seven is **granted**.

- Defendant's Request Number Eight is **granted.**

---

[87]*United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003); Notes of Advisory Committee on 1974 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16.

- Defendant's Request Number Nine is **granted as unopposed**.

- Defendant's Request Number Ten is **granted in part and denied in part**, with the limitations set forth above.

- Defendant's Request Number Eleven is **denied**, except to the extent the requested discovery contains potential impeachment evidence subject to mandatory disclosure under *Brady* and *Giglio*.

Additionally, to the extent the Court has granted Defendant's motion, the Government must produce the relevant discovery immediately, except with regards to the CI's identity or statements that fall within the scope of the Jencks Act. The Government must produce the relevant discovery with the CI's identity un-redacted by no later than fourteen days before trial, and the Court strongly encourages the Government to disclose any Jencks Act statements by no later than forty-eight hours before the Government intends to use the statements at trial.

## III.    Conclusion

Because Officer O'Neill lacked reasonable suspicion that Defendant had committed a traffic offense, the Court grants Defendant's motion to suppress. Additionally, the Court grants in part and denies in part Defendant's motion to compel, as explained more fully above.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Julio Cesar Perez-Madrigal's Motion to Suppress (Doc. 34) is **granted**.

**IT IS FURTHER ORDERED BY THE COURT** that Defendant Julio Cesar Perez-Madrigal's Second Motion to Compel (Doc. 35) is **granted in part and denied in part.**

**IT IS SO ORDERED.**

Dated: May 19, 2017

                                        S/ Julie A. Robinson
                                        JULIE A. ROBINSON
                                        UNITED STATES DISTRICT JUDGE